*In the*

# United States Court of Appeals

*for the*

# Eighth Circuit

---

UNITED STATES OF AMERICA EX REL. ELIZABETH D. HOLT,
*Relator-Appellant,*

v.

MEDICARE MEDICAL ADVISORS, INC.; CAREFREE SOLUTIONS USA INC.;
CAREFREE INSURANCE INC.; AETNA INCORPORATED; HUMANA, INC.;
UNITEDHEALTHCARE INSURANCE COMPANY,
*Defendants-Appellees.*

---

*On Appeal from the United States District Court for the Western District of Missouri (Kansas City),
Case No. 4:18-cv-00860-DGK · Honorable David Gregory Kays, District Judge*

## BRIEF OF APPELLANT ELIZABETH D. HOLT

TYLER W. HUDSON
**WAGSTAFF & CARTMELL LLP**
4740 Grand Avenue, Suite 300
Kansas City, Missouri 64112
Telephone: (816) 701-1100
thudson@wcllp.com

JAMES J. PEPPER
**THE PEPPER LAW FIRM, LLC**
68 East Court Street, Suite 2A
Doylestown, Pennsylvania 18901
Telephone: (215) 340-2500
pepper@jamespepperlaw.com

KENNETH A. WEXLER
KARA A. ELGERSMA
EAGHAN S. DAVIS
**WEXLER BOLEY & ELGERSMA LLP**
311 South Wacker Drive, Suite 5450
Chicago, Illinois 60606
Telephone: (312) 346-2222
kaw@wbe-llp.com
kae@wbe-llp.com
esd@wbe-llp.com

*Counsel for Plaintiff-Relator/Appellant Elizabeth D. Holt*

 

# SUMMARY OF THE CASE

Relator Holt's complaint in this *qui tam* action alleges violations of the False Claims Act ("FCA") involving the abuse of the Medicare Advantage program by several insurance companies and their agent, MMA. To market Medicare Advantage Plans ("MA Plans"), insurers must promise to adhere to a federal regulatory scheme, which limits the tactics that may be used to enroll beneficiaries. The insurers contract directly with the government, and they are legally responsible for the actions of any agents retained to sell MA Plans on their behalf. They have financial incentives to enroll as many beneficiaries as possible.

Against that backdrop, MMA violated numerous federal regulations—including cheating on the tests that certified individual agents to sell MA Plans. The insurers failed in their mandatory oversight of MMA, even after being given detailed information about MMA's misconduct. As a result of Defendants' fraud inducing the government to sanction their participation in Medicare Advantage, all claims for reimbursement were false claims.

The district court granted the Defendants' motions to dismiss, holding that the Defendants did not make "claims" for payment to the government and that any violations were immaterial. Relator Holt contests those rulings on this appeal.

Based on the complexity of the program and regulations at issue, oral argument likely would assist the Court. Relator requests twenty minutes.

i

**CORPORATE DISCLOSURE STATEMENT**

Relator Elizabeth Holt is not a corporate entity, nor is the United States, on whose behalf claims were brought.

Appellate Case: 23-2564     Page: 3     Date Filed: 09/22/2023 Entry ID: 5319197

# TABLE OF CONTENTS

SUMMARY OF THE CASE .......................................................................i

CORPORATE DISCLOSURE STATEMENT ......................................... ii

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF ISSUES ....................................................................2

STATEMENT OF THE CASE................................................................4

I.  How MA Organizations and their agents operate ................................6

II.  MMA consistently violated Medicare rules and regulations...............9

III. The Carrier Defendants ignored their certification promises. ...........14

IV. Defendants' deception induced CMS into contracts. ........................16

V.  Procedural history and issues on appeal .......................................17

SUMMARY OF THE ARGUMENT .....................................................19

ARGUMENT ....................................................................................22

I.  Legal standards .........................................................................23

    A.  Standard of Review ..............................................................23

    B.  Standards for FCA claims .....................................................23

II.  *Miller* is an important precedent on point, involving fraudulent inducement claims under the FCA. ..........................................................24

III. The Complaint sufficiently pleads knowing false statements by the Defendants. ..................................................................................28

IV. The District Court's conclusion that no Defendant made a claim under the FCA is wholly illogical as to the Carrier Defendants, and legally inaccurate as to MMA. ..........................................................................................32

Appellate Case: 23-2564    Page: 4    Date Filed: 09/22/2023 Entry ID: 5319197

A. The Carrier Defendants' claims to the government directly resulted in government funding for the Medicare Advantage Plans. ...........................33

B. MMA made claims under the FCA, by submitting applications for the Carrier Defendants, expecting that its claims would be paid through government funds. ......................................................................................37

V. The District Court also erred in concluding that the Defendants' actions were not material to the government. .........................................................................40

A. *Miller* and several other circuit cases are on point. ...................................40

B. Materiality, under *Escobar*, is met in this case. ..........................................44

VI. Alternatively, the Court should allow Relator Holt to amend her pleading. ......49

CONCLUSION ............................................................................................................50

CERTIFICATE OF COMPLIANCE .........................................................................51

CIRCUIT RULE 28(A)(h) CERTIFICATE .............................................................52

CERTIFICATE OF SERVICE .................................................................................53

Appellate Case: 23-2564    Page: 5    Date Filed: 09/22/2023 Entry ID: 5319197

# TABLE OF AUTHORITIES

## Cases

*Allison Engine Co. v. U.S. ex rel. Sanders*,
    553 U.S. 662 (2008) ........................................................................ passim

*Arthurs v. Global TPA LLC*,
    208 F. Fupp. 3d, 1260 (M.D. Fla. 2015) ...................................... 19, 28

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................23

*Blankenship v. Medtronic, Inc.*,
    No. 4:13-CV-1087 CEJ, 2014 WL 3818485 (E.D. Mo. Aug. 4, 2014) .................5

*Campbell v. Transgenomic, Inc.*,
    916 F.3d 1121 (8th Cir. 2019) ...................................................... 43, 44

*Cockram v. Genesco, Inc.*,
    680 F.3d 1046 (8th Cir. 2012) .............................................................23

*Cook Cnty., Illinois v. United States ex rel. Chandler*,
    538 U.S. 119 (2003) ..............................................................................6

*Haw. ex rel. Torricer v. Liberty Dialysis-Haw. LLC*,
    512 F. Supp. 3d 1096 (D. Haw. 2021) ...............................................44

*In re Baycol Prods. Litig.*,
    732 F.3d 869 (8th Cir. 2013) ...................................... 24, 25, 27, 42

*Martin v. Safe Haven Sec. Servs., Inc.*,
    19-00063, 2020 WL 13538608 (W.D. Mo. May 14, 2020) ...........................3, 49

*Sentis Group, Inc. v. Shell Oil Co.*,
    559 F.3d 888 (8th Cir. 2009) .......................................................3, 49

*Thayer v. Planned Parenthood of the Heartland*,
    No. 4:11-CV-129-JAJ, 2019 WL 13039126 (S.D. Iowa Apr. 1, 2019) ..............34

Appellate Case: 23-2564    Page: 6    Date Filed: 09/22/2023 Entry ID: 5319197

*United Health Servs., Inc. v. United States ex rel. Escobar*,
  579 U.S. 176, 136 S. Ct. 1989 (2016).................................................. 3, 26, 43, 44

*United States v. Care Alternatives*,
  No. 22-1035, 2023 WL 5494333 (3d Cir. Aug. 25, 2023) ...................... 43, 45, 48

*United States v. Strock*,
  982 F.3d 51 (2d Cir. 2020) .......................................................... passim

*United States and the State of New Jersey ex rel. Druding v. Care Alternatives*,
  No. 22-1035, 2023 WL 5494333 (3d Cir. Aug. 25, 2023) ....................................3

*United States ex rel. Brooks v. Stevens-Henager Coll.*,
  305 F. Supp. 3d 1279 (D. Utah 2018).............................................................3, 49

*United States ex rel. Hendow v. University of Phoenix*,
  461 F.3d 1166 (9th Cir. 2006) ...................................................... passim

*United States ex rel. Main v. Oakland City Univ.*,
  426 F.3d 914 (7th Cir. 2005) .................................................................................36

*United States ex rel. Miller v. Weston Educational, Inc.*,
  840 F.3d 494 (8th Cir. 2016) ...................................................... passim

*United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 892 F.3d 822 (6th Cir. 2018) .................................... 27, 43, 45, 46

*United States ex rel. Roop v. Hypoguard USA, Inc.*,
  559 F.3d 818 (8th Cir. 2009) ................................................................................49

*United States ex rel. Taylor v. Boyko*,
  39 F.4th 177 (4th Cir. 2022) ...........................................................................2, 34

*United States ex rel. USN4U, LLC v. Wolf Creek Fed. Servs., Inc.*,
  34 F.4th 507 (6th Cir. 2022) ................................................................................43

**Statutes**

False Claims Act, 31 U.S.C. § 3729 ................................................................. passim

**Rules**

42 C.F.R. § 422.2264 ...............................................................................................12

Appellate Case: 23-2564     Page: 7     Date Filed: 09/22/2023 Entry ID: 5319197

42 C.F.R. § 422.2272 .................................................................................37

42 C.F.R. § 422.510 ...................................................................................19

42 CFR § 422.2268 ....................................................................................13

42 U.S.C. § 422.504 ...................................................................................14

42 U.S.C. § 422.505 ...................................................................................22

Appellate Case: 23-2564    Page: 8    Date Filed: 09/22/2023 Entry ID: 5319197

# JURISDICTIONAL STATEMENT

a) The district court had subject-matter jurisdiction because this case arose under federal law and, therefore, presented a federal question. Relator Elizabeth Holt filed this *qui tam* action on behalf of the United States, alleging that all Defendants violated the False Claims Act, 31 U.S.C. § 3729, *et seq*.

b) This Court has appellate jurisdiction under 28 U.S.C. § 1291, based on Relator's direct appeal from the grant of all Defendants' motions to dismiss by the U.S. District Court for the Western District of Missouri. (Add. 1; App. 410; R. Doc. 101.) Thus, Relator/Appellant is appealing from a final judgment of a district court within the Eighth Circuit. (Add. 18; App. 427; R. Doc. 102.)

c) The district court entered judgment on August 23, 2022. (Add. 18; App. 427; R. Doc. 102.) On September 20, 2022, within 28 days from judgment, Relator filed a motion to alter or amend the judgment under Rule 59(e). (App. 428, R. Doc. 103; App. 431, R. Doc. 104.) The district court denied Relator's Rule 59 motion on June 2, 2023. (Add. 22; App. 469; R. Doc. 109.) Relator timely filed her Notice of Appeal on June 30, 2023, pursuant to Fed. R. App. P. 4(a)(1)(A) and 4(a)(4)(A)(v). (App. 473, R. Doc. 110.)

d) The district court's Order and subsequent judgment disposed of all claims against all parties. (Add. 22; App. 410; R. Doc. 101; App. 427; R. Doc. 102.)

1

## STATEMENT OF ISSUES

1.      The Carrier Defendants[1] all submitted applications to the government to obtain funds for their Medicare Advantage plans. MMA[2] submitted claims to the carriers for commissions to be paid by the government, based on enrollments in MA Plans. Did the district court err in holding that no Defendant made a claim for payment to the government?

- *United States ex rel. Miller v. Weston Educational, Inc.*, 840 F.3d 494 (8th Cir. 2016)

- *Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662 (2008)

- *United States ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166 (9th Cir. 2006)

- *United States ex rel. Taylor v. Boyko*, 39 F.4th 177 (4th Cir. 2022)

- 31 U.S.C. § 3729(a)-(c)

2.      MMA submitted thousands of applications for payment based on Medicare Advantage enrollees who were signed up through improper means, by agents who were not properly certified. The government has extensive regulations to prevent fraud in the Medicare Advantage program, which insurance carriers and

---

[1] The "Carrier Defendants" include Aetna Inc., Human Inc., and United Healthcare Ins. Co.

[2] "MMA" refers to Defendants Medicare Medicaid Advisors, Inc. and Medicare Medicaid Advisors USA, Inc.

2

their agents must agree to follow in order to participate. Did the district court err in

concluding that any violations by the Defendants were immaterial?

- *United States ex rel. Miller v. Weston Educational, Inc.*, 840 F.3d 494 (8th Cir. 2016)

- *United Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 136 S. Ct. 1989 (2016)

- *United States and the State of New Jersey ex rel. Druding v. Care Alternatives*, No. 22-1035, 2023 WL 5494333 (3d Cir. Aug. 25, 2023)

- *United States v. Strock*, 982 F.3d 51 (2d Cir. 2020)

3.     **If necessary:** Did the district court err in granting the motions to

dismiss without giving the Relator an opportunity to amend her complaint to

address any perceived deficiencies?

- *Sentis Group, Inc. v. Shell Oil Co.*, 559 F.3d 888 (8th Cir. 2009)

- *Martin v. Safe Haven Sec. Servs., Inc.*, 19-00063, 2020 WL 13538608 (W.D. Mo. May 14, 2020)

- *United States ex rel. Brooks v. Stevens-Henager Coll.*, 305 F. Supp. 3d 1279 (D. Utah 2018)

3

## STATEMENT OF THE CASE

Relator Holt alleges that Defendants Aetna, Humana, and UnitedHealthcare (the "Carrier Defendants")[3]; MMA; and Carefree violated the federal False Claims Act by scheming to obtain government funds via the Medicare Advantage program, without ever intending to comply, or actually complying, with the conditions of participation. Funded in part by Carefree, and with the Carrier Defendants' knowledge, MMA violated numerous federal regulations to increase the number of participants on the Medicare Advantage program, thereby defrauding the government and bringing in additional funds for all Defendants. The Defendants' fraud induced the government to fund these Medicare Advantage Organizations at all, and it induced the government to pay claims that were impliedly certified as legitimate, when they were not.

Medicare Advantage is a federally funded alternative to traditional Medicare, run through private insurance companies such as the Carrier Defendants. (App. 030-31; R. Doc. 27, ¶¶ 42-47.) Medicare Advantage marketing is strictly regulated to ensure that vulnerable Medicare recipients are properly informed of their rights, opportunities, and benefits. (App. 031; R. Doc. ¶ 47.) Given that carriers and agents working on their behalf are financially incentivized to enroll as

---

[3] Blue Cross & Blue Shield of Kansas City was initially a Defendant but is no longer in the case.

Appellate Case: 23-2564     Page: 12     Date Filed: 09/22/2023 Entry ID: 5319197

many Medicare beneficiaries as possible—as detailed below—the risk of Medicare fraud is massive. As detailed in a recent U.S. Senate report, a government investigation revealed "a range of predatory actions" by sellers/sponsors of MA Plans.[4] The report concludes, in part:

> [W]e are seeing that marketing practices by private plans (or their agents and brokers) need to be reined in: bad actors are trying to cash in by taking advantage of loopholes and loosened rules around marketing and enrollment to beneficiaries—badgering seniors on the phone, confusing them on television, and inundating them with mountains of mail. An increasing number of marketing materials are either fraudulent or deceptive, undermining beneficiary access to care and trust in the Medicare program.[5]

These regulations also protect the government from abuse by Medicare Advantage Organizations ("MA Organizations"), such as the Carrier Defendants, and by third-party agents working on their behalf, such as MMA. The False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, permits the federal government to recoup losses from abuse of the Medicare Advantage program, as well as other programs.

---

[4] *See Deceptive Marketing Practices Flourish in Medicare Advantage: A Report by the Majority Staff of the U.S. Senate Committee on Finance*, Chairman Ron Wyden, Nov. 3, 2022, at p. 3. Report available at: https://www.finance.senate.gov/imo/media/doc/Deceptive%20Marketing%20Practices%20Flourish%20in%20Medicare%20Advantage.pdf (last visited Sept. 15, 2023). This Court may take judicial notice of this government report. *See United States v. Trans-Missouri Freight Ass'n*, 166 U.S. 290, 364 (1897) (permitting judicial notice of Congressional reports); *Blankenship v. Medtronic, Inc.*, No. 4:13-CV-1087 CEJ, 2014 WL 3818485, at *2 (E.D. Mo. Aug. 4, 2014) (holding that Senate reports were necessarily embraced by the complaint). Here, the report is offered as background information for the Court.

[5] *Id.* at 21.

The FCA is intended "to reach all types of fraud, without qualification, that might result in financial loss to the Government." *Cook Cnty., Illinois v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003). A violation occurs when a person or company "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the government. 31 U.S.C. § 3729(a)(1)(A). A violation also occurs when a person or company "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

## I.    How MA Organizations and their agents operate

To market and service MA Plans, the Carrier Defendants (and others) seek designation by the Centers for Medicare and Medicaid Services ("CMS") to be MA Organizations. (App. 031; R. Doc. 27, ¶¶ 43-45.) MA Organizations are the only entities authorized by the government (CMS) to offer MA Plans. (App. 031; R. Doc. 27, ¶¶ 43-44.) MA Organizations—including the Carrier Defendants—contract with entities such as MMA, which acts as a general agent, utilizing a network of individual agents to market and service MA Plans. (App. 031-32; R. Doc. 27, ¶¶ 44, 49-52.)

MA Organizations, including the Carrier Defendants, and agents, such as MMA, increase their profits with each new Medicare Advantage beneficiary they sign up. (App. 077; R. Doc. 27, ¶ 239.) The Carrier Defendants receive money for

every beneficiary that enrolls in their MA Plans. (App. 075; R. Doc. 27, ¶ 230.) The more beneficiaries enrolled, the more this government money adds up. For instance, in 2017, Missouri reported that CMS paid more than $568 million in premiums to Aetna, Anthem (Blue Cross), Coventry (Aetna), and Humana, for 55,923 Medicare Advantage beneficiaries in the state of Missouri. (App. 076; R. Doc. 27, ¶ 236.) These payments led to $128 million in profits for these carriers. (App. 076; R. Doc. 27, ¶ 237.)

Agents such as MMA are paid by commissions, and those commissions are similarly tied to the number of beneficiaries enrolled in MA Plans. (App. 032, 041; R. Doc. 27, ¶¶ 52-53, 98-101.) For instance, in 2018 in St. Louis County, CMS provided commissions of $455 for each new beneficiary and $228 for each renewal, up to six years. (App. 041; R. Doc. 27, ¶ 99.) MMA paid its individual agents up to $165 for each new MA Plan obtained, so MMA received a profit of at least $290 for each new Medicare Beneficiary signed up in St. Louis County in 2018. (App. 041; R. Doc. 27, ¶¶ 98-100.) Assuming the accuracy of MMA's claim of having sold more than 70,000 MA Plans, it has potentially generated more than $100 million in commissions. (App. 041; R. Doc. 27, ¶ 102.) As alleged, every one of these commissions was obtained fraudulently. (App. 041; R. Doc. 27, ¶ 103.)

Medicare Advantage commissions, paid to agents, are funded by CMS pursuant to contracts between CMS and MA Organizations. (App. 033-034; R.

7

Doc. 27, ¶¶ 59-62.) Commissions are separate line items in the applications that carriers submit to CMS to obtain Medicare Advantage contracts. (App. 035; R. Doc. 27, ¶ 65.) The commissions are paid entirely by federal dollars, distributed to agents by the carriers. (App. 035; R. Doc. 27, ¶ 67.)

A system that rewards private companies with public money for enrolling individuals from a vulnerable population—seniors—comes with a high risk of abuse. To protect seniors and itself from such abuse, the government has enacted extensive regulations that govern MA Organizations and their agents. To participate in Medicare Advantage, MA Organizations, including the Carrier Defendants, contract with CMS, conditioned on the promise that they will comply with "Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including but not limited to, applicable provisions of Federal criminal law, the False Claims Act (31 U.S.C. 3729 *et seq.*) and the anti-kickback statute (section 1128B(b)) of the Act)." (App. 077; R. Doc. 27, ¶ 241.) CMS will only authorize MA Organizations that sign a Part C Certification, which obligates the organization to adhere to "all marketing requirements" in the federal regulations. (App. 083; R. Doc. 27, ¶¶ 274-76.) These requirements obligate all MA Organizations (Carrier Defendants) to ensure that all agents working on their behalf will adhere to CMS's certification requirements. (App. 035; R. Doc. 27, ¶ 70); 42 C.F.R. § 422.2274 (c). This requirement means that MA Organizations

8

must make certain their agents are properly trained on the Medicare requirements and the details of the products being offered. (App. 038; R. Doc. 27, ¶ 81.)

The agent certification requirements are a key part of the regulatory scheme and one that MMA routinely and purposefully violated. CMS requires that agents complete training through an approved vendor. Most large carriers, including those served by MMA, use America's Health Insurance Plans ("AHIP") as their approved vendor. (App. 037; R. Doc. 27, ¶ 76.) All agents must score at least 85% on an annual exam to be certified to sell MA Plans. (App. 037; R. Doc. 27, ¶ 77.) Further, there must be procedures in place to make sure that all agents take the test independently, "maintaining the integrity of the training and testing program." (App. 037; R. Doc. 27, ¶ 78.)

## II. **MMA consistently violated Medicare rules and regulations**.

To reap profits for itself and the Carrier Defendants, MMA routinely violated the Medicare rules and regulations, beginning with the certification process. Since 2008, all agents have been required to meet testing and certification requirements to sell MA Plans. (App. 036; R. Doc. 27, ¶ 72.) For years, MMA has falsely attested that its agents were fully AHIP- and carrier-certified, to obtain sales commissions from CMS, when MMA knew the agents were not legally certified. (App. 040; R. Doc. 27, ¶ 91.) Indeed, MMA imposed conditions on the certification process that ensured invalid certifications. (App. 20-23; R. Doc. 27, ¶¶

9

104-19.) Thereafter, MMA directed a scheme by which its agents used illegal methods to sell MA Plans to vulnerable seniors. (App. 040; R. Doc. 27, ¶ 93.)

MMA's version of "independent" testing flouts the requirements intended to ensure proper training before agent certification. In every way, the certifications are tainted:

- MMA requires agents to take certification exams *en masse*, with MMA representatives available to help them answer questions. (App. 042; R. Doc. 27, ¶ 109.)

- MMA requires all agents to use the same password to provide MMA with access to manipulate answers and, ultimately, results. (App. 044; R. Doc. 27, ¶ 116.)

- MMA also takes exams for agents whom it does not believe can pass, and at times it takes the exams for agents who are not even present. (App. 042; R. Doc. 27, ¶ 109.)

- When agents finish the test, they are instructed to raise their hands so that an MMA representative can review their answers. MMA submits the tests only after reviewing them and correcting mistakes. (App. 042; R. Doc. 27, ¶ 110.)

As a result of these circumstances, Relator Holt alleges that no MMA agents have ever been Medicare Advantage certified or carrier-certified under CMS-mandated

10

conditions. (App. 044; R. Doc. 27, ¶ 117.) Commissions, paid by federal dollars, should never have been paid because MMA agents were not "in good standing," having never legitimately taken annual certification tests, achieving scores of 85% or better. (App. 032-33; R. Doc. 27, ¶¶ 55-57.)

The problems are not MMA's alone. CMS mandates that MA Organizations ensure that any agents working on their behalf comply with all certification requirements. (App. 035-36; R. Doc. 27, ¶¶ 70-71.) Yet, none of the Carrier Defendants ensured MMA's compliance. Instead, MMA engaged in widespread fraud that bypassed the certification rules and prevented any agents from being properly eligible to sell MA Plans. (App. 042-44; R. Doc. 27, ¶¶ 73, 109-17.) Just as MMA was obligated to certify agents through the CMS-mandated process, the MA Organizations should have prevented payments of federal dollars to agents who were not properly, annually trained and tested with scores of at least 85%. (App. 045; R. Doc. 27, ¶¶ 121-22.)

Violations of the Medicare rules did not end with the faulty certification process and failed oversight. Because MMA's sales force consisted of untrained, improperly certified agents, MMA was free to direct them to violate numerous rules and regulations in the process of selling MA Plans, to add more beneficiaries to the ledger. The following is a summary of the actions MMA took in selling plans that violated the Medicare rules, to pad its bottom line:

- **Door knocking:** The Medicare regulations prohibit door-to-door marketing of MA Plans by MA Organizations or their agents. *See* 42 C.F.R. § 422.2264(a)(2). Yet, MMA tells its agents that "door knocking is the lifeblood of our company" and instructs agents to sell plans door-to-door. Specifically, agents are instructed to knock on a door and then hit the houses next door and the house across the street, to try to sign up more beneficiaries. (App. 049-50; R. Doc. 27, ¶¶ 139-42.)

- **Cold calls:** The Medicare regulations forbid cold-calling potential beneficiaries, but MMA makes cold-calling a central piece of its marketing strategy. To try to skirt the rules, MMA instructs agents to try to get the potential customer to call them back, so that MMA can point to a customer-initiated call in its records. (App. 050; R. Doc. 27, ¶ 143); 42 C.F.R. § 422.2264 (a)(2)(iv).

- **Lead cards:** Medicare-eligible individuals are provided with "lead cards" that they can sign and send in if they want more information—thereby authorizing agents to contact them. Instead, MMA instructs its agents to approach seniors with unsigned lead cards and attempt to get signatures "for storage." (App. 051-53; R. Doc. 27, ¶¶ 149-55); 42 C.F.R. § 422.2264(a)(3).

12

- **Ignoring scope of appointment requirements:** 2008 guidance by CMS limits sales of MA Plans to those within the scope of an appointment already agreed to by the beneficiary. MMA completely disregards this requirement through its cold calls, door-to-door sales, and other improper marketing tactics. (App. 058-59; R. Doc. 27, ¶¶ 179-84); 42 C.F.R. § 2264(c)(3).

- **Promoting plan-switching:** The Medicare regulations forbid promotion of plan-switching for any reason other than the best interests of the beneficiary. *See* 42 CFR § 422.2268 (e), (j). Yet, MMA instructs agents to try to switch beneficiaries to new plans whenever doing so would benefit MMA's bottom line by helping the carriers with which it does business. MMA tells its agents that they cannot not hurt the beneficiaries through this practice, but this statement is patently untrue, as switching often takes away medications or removed doctors from beneficiaries' approved lists. (App. 062-64; R. Doc. 27, ¶¶ 193-201.)

- **Enrolling outside of approved periods:** Medicare Advantage has a defined enrollment period, usually from October to December. Enrollment requests may not be submitted outside of this period. Yet, MMA instructs agents to enroll Medicare beneficiaries outside of the defined periods and leave the date on the application blank, so that MMA

13

can post-date it within the approved period. (App. 073-74; R. Doc. 27, ¶¶ 223-25.)

- **Star Ratings:** MMA also works with the Carrier Defendants to bring in more federal money by artificially inflating star ratings. CMS incentivizes MA Organizations to provide good service by giving them larger payments when their customer ratings reach certain levels. Complaints to CMS reduce those ratings. Thus, MMA instructs all beneficiaries to direct all complaints to MMA, so that CMS does not receive complaints and the Carrier Defendants obtain more federal funds through inflated star ratings. (App. 089-94; R. Doc. 27, ¶¶ 307-35.)

## III.  The Carrier Defendants ignored their certification promises.

Every year, the Carrier Defendants resubmit Medicare Advantage bids and their applications to be MA Organizations include Part C certifications, in which they promise to adhere to all marketing regulations and guidance. (App. 034-35, 083; R. Doc. 27, ¶¶ 62-67, 272-76); *see also* 42 U.S.C. § 422.504(a)(10) (bids are "annual"). CMS requires the Carrier Defendants to "ensure" that agents such as MMA comply with certification requirements, so that such agents know the rules about how they may market MA Plans. (App. 035; R. Doc. 27, ¶¶ 70-71); *see also* 42 CFR §§ 422.2274(c)-(d). There is no evidence that the Carrier Defendants have taken any steps to comply with that duty. MMA was violating rules and regulations

14

with impunity, and therefore all of the Part C certifications submitted to CMS by the Carrier Defendants were false.

Further, the Carrier Defendants did nothing to stop MMA after being given detailed information about MMA's misconduct. Relator Holt put each of the Carrier Defendants on notice about MMA's illegal conduct on September 11, 2017.[6] (App. 025, 077; R. Doc. 27, ¶¶ 9, 243-44.) She explained in detail the numerous rules violations MMA committed in selling MA Plans. (App. 078; R. Doc. 27, ¶ 245.) The notices made no difference. The Carrier Defendants continued to use MMA, unfettered, to sell their MA Plans, and Aetna continued to invest in MMA through Carefree, its wholly owned subsidiary. (App. 080; R. Doc. 27, ¶¶ 9, 255.) Thus, since at least 2017, the Carrier Defendants have known that federal funds they received and, in part distributed to MMA, disguised kickbacks because none of them was following "all applicable state and federal laws, regulations and requirements," as the regulations require. (App. 025; R. Doc. 27, ¶ 13.)

---

[6] Relator Holt is not suggesting that the Carrier Defendants could not be liable for certifications made before September 2017. That issue will need to be determined through discovery. Notably, the scienter standard includes recklessness. As one circuit court wrote: "Congress added the 'reckless disregard' prong to the definition of knowledge in the False Claims Act 'to target that defendant who has 'buried his head in the sand' and failed to make some inquiry into the claim's validity.'" *United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 892 F.3d 822, 837 (6th Cir. 2018).

Appellate Case: 23-2564     Page: 23     Date Filed: 09/22/2023 Entry ID: 5319197

Aetna was the only Defendant to take any action whatsoever in response to Relator Holt's letter. (App. 079; R. Doc. 27, ¶¶ 247-48.) Aetna hired outside counsel who spoke with Holt. (App. 079; R. Doc. 27, ¶¶ 249.) In the end, however, Aetna did nothing more than insist that many of MMA's agents be recertified, without even ensuring that the new certification tests were taken properly. (App. 079; R. Doc. 27, ¶¶ 250-51.) Nothing of substance came of Aetna's so-called "investigation." (App. 080; R. Doc. 27, ¶ 254.) Despite federal regulations requiring that MA Organizations "oversee entities to ensure agents/brokers abide by all applicable state and federal laws, regulations, and requirements," Defendants' conduct here remains unchecked and unremedied. (App. 033; R. Doc. 27, ¶ 57.)

## IV.    Defendants' deception induced CMS into contracts.

Through the actions above, the Carrier Defendants and MMA have deceived CMS into entering into contracts that it would not have entered, and into paying claims and commissions that it would not have paid, had it been fully informed of Defendants' actions. By engaging in this widespread sales agent certification fraud, MMA has been able to send out unqualified agents to sell MA plans to Medicare beneficiaries and, in turn, obtain commissions to which, absent this fraud, it would not have been entitled. (App. 044; R. Doc. 27, ¶ 113.) Relator Holt alleges that "[e]ach and every commission (either for a new enrollee or for a renewal of a

16

MAP) paid to MMA based on sales of MAPs that occurred as a result of its agents'
violations of CMS regulations would not have been paid if CMS knew about
MMA's violations of CMS regulations." (App. 048; R. Doc. 27, ¶ 134.) As to the
Carrier Defendants, Relator Holt alleges that "[i]f CMS had known that signed
MAP applications" submitted by the Carrier Defendants "were obtained as a result
of violation of applicable state and federal laws, regulations and requirements,
CMS would never have verified the enrollment of these beneficiaries into
Medicare Advantage program." (App. 100; R. Doc. 27, ¶ 375.)

## V.    Procedural history and issues on appeal

All Defendants filed motions to dismiss in the district court. (App. 107, 140,
175, 210; R. Doc. 67, 69, 74, 76.) Relator Holt filed oppositions to those motions.
(App. 245, 277, 304, 327; R. Doc. 83, 84, 85, 86.) On August 22, 2022, the district
court entered its Order granting the motions. (Add. 17; App. 410; R. Doc. 101.)
The next day, the court entered judgment. (Add. 18; App. 427; R. Doc. 102.) On
September 20, 2022, Plaintiffs filed a motion under Rule 59(e), seeking
reconsideration of the dismissal. (App. 428; R. Doc. 103.) After the motion was
fully briefed, the court denied that motion on June 2, 2023. (Add. 19; App. 469; R.
Doc. 109.) This appeal followed.

On appeal, Relator Holt challenges the decision dismissing her case. In the alternative, she challenges the court's decision to enter judgment with prejudice and deny her request to replead.

18

## SUMMARY OF THE ARGUMENT

Relator Holt has alleged, with compelling facts, more than plausible claims, that the Defendants' violation of the Medicare rules and regulations, and their concealment of those violations, fraudulently induced the government—via CMS—into allowing them into the Medicare Advantage program which resulted in government payments to the Defendants. *United States ex rel. Miller v. Weston Educational, Inc.*, 840 F.3d 494 (8th Cir. 2016), in which this Court reversed the grant of summary judgment on an FCA claim, is at least instructive, and arguably dispositive, of the issues raised herein.

Here, as in *Miller*, the Defendants concealed from the government their widespread fraud, from the inception of their participation in Medicare Advantage. *See Miller*, 840 F.3d at 500-03. This fraud occurred whenever the Carrier Defendants, who were responsible for MMA's actions, annually represented their compliance with Medicare rules and regulations, and whenever MMA sought payment for commissions, based on enrollments obtained through improper means by agents who were never properly certified. *See Arthurs v. Global TPA LLC*, 208 F. Fupp. 3d, 1260, 1267 (M.D. Fla. 2015) (stating that "participation in the Medicare Advantage program is conditioned as a matter of law on [ ] compliance with Medicare's marketing regulations."); 42 C.F.R. § 422.510(4)(viii). As in *Miller*, because the Carrier Defendants made fraudulent misrepresentations to join

19

the program, and because MMA made fraudulent omissions every time it made claims for payment, every transaction was tainted and invalid due to all Defendants' fraud in the inducement. *See Miller*, 840 F.3d at 504.

*Miller* lays out four elements that must be met to establish a fraud in the inducement claim in the context of the FCA: that "(1) the defendant made a "false record or statement"; (2) the defendant knew the statement was false; (3) the statement was material; and (4) the defendant made a "claim" for the government to pay money or forfeit money due." *Id.* at 500. The allegations above establish the first two elements, and the district court did not hold otherwise. Moreover, the district court erred in concluding that Relator Holt did not allege facts, which, taken in her favor, would state a plausible claim that Defendants made "claims for payment," and in concluding that the Defendants' regular and intentional violations of numerous Medicare regulations were immaterial, as a matter of law.

As to the "claim" for payment element, the allegations and basic logic dictate that the Carrier Defendants made "claims" to the government for payment. That is how the system works—the MA Organizations send in their applications based on the number of beneficiaries they intend to serve, and then the government funds those organizations. The district court reasoned that there was no allegation that the government paid too much money per beneficiary. But there are allegations that the number of beneficiaries was inflated. And regardless, that point

does not address whether the Carrier Defendants made claims for payment—they did.

Per the FCA, MMA also made claims for payment, even though it did not interact directly with CMS. As discussed by the U.S. Supreme Court, a subcontractor makes a claim for payment under Section 3729(a)(2) when it "submits a false statement to the prime contractor intending for the statement to be used by the prime contractor to get the Government to pay its claim." *Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662, 670 (2008).

As to materiality, *Miller* is highly persuasive because this Court determined that there was a question of fact on materiality, sufficient to defeat summary judgment, relating to FCA claims brought under an analogous theory of fraudulent inducement. *See Miller*, 840 F.3d at 504-05. Further, several other recent circuit decisions have found materiality, on less compelling sets of facts than those present here. Moreover, allegations that compliance with rules was a condition of participation in the program at issue, as well as allegations that the defendants' violations of those rules were widespread and consistent, led to findings of materiality. Similar allegations are also present in this case, so this Court should likewise determine that there is a question of fact on the issue of materiality.

Alternatively, this Court should at least remand the case to allow Relator Holt to replead to address any perceived deficiencies in her complaint. This Court

21

should reverse the district court's erroneous decision to dismiss Relator Holt's complaint with prejudice.

## ARGUMENT

The district court erred in dismissing Relator Holt's case. She has stated facts, when viewed in her favor, that state plausible claims that the Carrier Defendants and MMA defrauded the government by soliciting plan disbursements and commissions for MA Plans that were obtained through serial violations of federal rules and regulations. The Carrier Defendants falsely certified, annually,[7] that they would follow these rules and regulations, including ensuring downstream entities, like MMA, were CMS-compliant. MMA's widespread, company-directed fraud caused the Carrier Defendants' certifications to be false. Further, under settled law, MMA impliedly certified that its commissions were based on legitimate sales of MA Plans, when they were not. Relator Holt alleges that CMS would not have paid any of these funds to the Defendants if it had known that the Defendants did not intend to follow the rules and regulations, from the beginning.

---

[7] All MA Organizations must submit an application to CMS annually, and they operate on one-year roll-over contracts. *See* 42 U.S.C. § 422.504(a)(10) (listing requirements for their "annual bid"); 42 U.S.C. § 422.505(c) (stating that contracts are renewed annually unless contrary action is taken).

Appellate Case: 23-2564     Page: 30     Date Filed: 09/22/2023 Entry ID: 5319197

## I.    Legal standards

### A.    Standard of review

This Court reviews a dismissal with prejudice resulting from a Rule 12 motion *de novo*. *Cockram v. Genesco, Inc.*, 680 F.3d 1046, 1056 (8th Cir. 2012). The court "accept[s] the allegations contained in the complaint as true and draw[s] all reasonable inferences in favor of the nonmoving party." *Id.* To survive a motion to dismiss, a complaint must contain "enough facts to state a claim of relief plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

### B.    Standards for FCA claims

Under Eighth Circuit law, a Relator may base an FCA claim on a theory of fraudulent inducement. In such cases, "FCA liability attaches to each claim submitted to the government under contract so long as the original contract was obtained through false statements or fraudulent conduct." *United States ex rel. Miller v. Weston Educational, Inc.*, 840 F.3d 494, 499 (8th Cir. 2016) (citations omitted). This Court has further clarified the law as follows:

> This fraud did not spend itself with the execution of the contract. Its taint entered into every swollen estimate which was the basic cause for payment of every dollar paid by the [government]…. The initial fraudulent action and every step thereafter taken, pressed ever to the ultimate goal—payment of government money to persons who caused it to be defrauded. ... [C]laims for payment subsequently submitted under and contract initially induced by fraud do not have to false or fraudulent in and of themselves in order to state a cause of action under the FCA.

*In re Baycol Products Litigation*, 732 F.3d 869, 875 (8th Cir. 2013). Other circuits agree. *See, e.g.*, *United States ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1170-71 (9th Cir. 2006) ("The False Claims Act ... is not limited to such facially false or fraudulent claims for payment. Rather … each and every claim submitted under a contract, loan guarantee, or other agreement which was originally obtained by means of false statements or other corrupt or fraudulent conduct, or in violation of any statute or applicable regulation, constitutes a false claim.").

## II.    *Miller* is an important precedent on point, involving fraudulent inducement claims under the FCA.

Although it arises in a different procedural context, this case bears substantial similarity to *Miller*, a case that provides the framework for reviewing whether Relator Holt has stated a claim. In *Miller*, as here, the relator's claim was based primarily on the theory that the government would never have entered into contracts with the defendant if the government had known about the defendant's fraud. *Miller*, 840 F.3d at 500, 503-04. In *Miller*, relators sued Heritage College, alleging that it fraudulently induced the Department of Education to pay funds by promising to keep accurate student records. *Miller*, 840 F.3d at 498. On appeal, this Court reversed a grant of summary judgment on the relators' claims under the False Claims Act. *Id.*

24

The defendant, Heritage, applied to the government for aid under Title IV by signing a Program Participation Agreement. *Id.* The agreement obligated Heritage to establish and maintain the records and procedures necessary "to ensure proper and efficient administration of funds." *Id.* The school agreed to document each student's eligibility, as well as information about refunds received on behalf of any student. *Id.* The relators submitted evidence that Heritage altered grade and attendance records from 2006 to 2012 to ensure that students remained eligible and to avoid any refunds, thereby maximizing Title IV funds. *Id.*

In reversing the grant of summary judgment, this Court stated that under a fraudulent inducement theory, "FCA liability attaches to 'each claim submitted to the government under a contract so long as the original contract was obtained through false statements or fraudulent conduct.'" *Id.* at 499 (quoting *In re Baycol Prods. Litig.*, 732 F.3d 869, 876 (8th Cir. 2013), and citing numerous other cases). The Court also specified the four elements of a fraudulent inducement claim under the FCA: that "(1) the defendant made a "false record or statement"; (2) the defendant knew the statement was false; (3) the statement was material; and (4) the defendant made a "claim" for the government to pay money or forfeit money due." *Id.* at 500.

The *Miller* Court first assessed whether the evidence supported a conclusion that Heritage acted with the necessary intent. For FCA liability to attach, the

25

defendant "must have 'actual knowledge of the information,' or act in 'deliberate ignorance' or 'reckless disregard' of the truth or falsity of the information." *Id.* (citing 31 U.S.C. § 3729(b)). The evidence showed that Heritage had policies requiring it to comply with government regulations, that Heritage consistently falsified records, and that Heritage sought to maximize its Title IV funding. *Id.* at 501-02. Therefore, "a reasonable jury could find that Heritage knew it had to keep accurate grade and attendance records and intended not to do so." *Id.* at 502. This Court reached this conclusion even though none of the altered records impacted Title IV disbursements or refunds, and even though most of the evidence used to show intent occurred after Heritage signed the PPA. Ultimately, the contrary evidence presented a fact question for the jury. *Id.* at 502-03.

This Court also held that there was a fact dispute on the materiality element. "A false statement or record is 'material' for FCA purposes if either (1) a reasonable person would likely attach importance to it or (2) the defendant knew or should have known that the government would attach importance to it." *Id.* at 503 (citing *United Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 136 S. Ct. 1989, 2002-03 (2016)). The Court rejected Heritage's argument that its fraud was immaterial because it was not directly connected with the funds submitted. Liability attaches to every claim submitted pursuant to a government contract whenever "the original contract was obtained through false statements or

26

fraudulent conduct." *Id.* at 504 (citing *In re Baycol*, 732 F.3d at 875-76.) The issue was whether the fraud was material to the government's willingness to enter into contracts with Heritage, and there was a fact dispute on that issue. Participation in the program was conditioned on compliance with the government's record-keeping requirement. The Court considered whether a "reasonable person" would attach importance to the promises made, and determined that one could. *Id.* at 504.

Relator Holt pleads all the facts *Miller* said are necessary elements for a claim based on fraudulent inducement. As alleged in the complaint, the Carrier Defendants promised to abide by all regulations in gaining access to government funds. This was a false promise, as MMA failed to certify its agents, leading to widespread violations of numerous rules and regulations, unsupervised by the Carrier Defendants (despite their obligation to supervise MMA). Worse, as of 2017 at the latest, the Carrier Defendants had actual notice of MMA's conduct. Thus, the Complaint sets forth a claim that Defendants fraudulently induced the provision of government funds, and every transaction is tainted by fraud, as in *Miller* and other cases. *See, e.g.*, *United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 892 F.3d 822 (6th Cir. 2018) (stating that a defendant's misrepresentation through omission, when making a claim for payment under the FCA, "renders the claim 'false or fraudulent' under § 3729(a)(1)(A)"); *United States ex rel. Brooks v. Stevens-Henager Coll.*, 305 F. Supp. 3d 1279 (D. Utah 2018) ("Promissory fraud,

27

which is also referred to as fraudulent inducement, is a theory that attaches liability to each and every claim submitted under a contract obtained through fraudulent statements.").

The following section will address each of the four elements of fraudulent inducement as laid out in *Miller*, two of which formed the basis for the district court's erroneous decision.

**III. The Complaint sufficiently pleads knowing false statements by the Defendants.**

The first two *Miller* elements need not be addressed extensively, as neither formed the basis for the district court's decision. But as summarized above and detailed in the Complaint, Relator Holt has alleged, with particularity, that the Defendants knowingly made false statements or material omissions. Taken as true, these facts state claims for relief.

As discussed above, the participation of MA Organizations, including the Carrier Defendants, in the Medicare Advantage program is conditioned by law on compliance with Medicare's marketing regulations. (App. 077; R. Doc. 27, ¶ 241.) 42 C.F.R. § 422.510(4)(viii); *Arthurs*, 208 F. Fupp. 3d at 1267. MA Organizations also must sign a Part C certification, which promises that the organization will adhere to "all marketing requirements" in the federal regulations. (App. 083; R. Doc. 27, ¶¶ 274-76.) The signatory agrees that s/he is "an authorized representative, officer, chief executive officer, or general partner of the business

28

organization that is applying for qualification to enter a Part C contract." (App. 084; R. Doc. 27, ¶ 274.) By signing, the Carrier Defendants promised to "abide by the requirements contained in Section 3 of this Application and provide the services outlined in [the] application." (App. 083; R. Doc. 27, ¶ 275.) Section 3 affirms that "Applicant agrees to adhere to all marketing requirements in 422.2260 through 422.2276 of the Medicare Marketing Guidelines." (App. 083; R. Doc. 27, ¶ 276.) These Defendants, if they utilize agents such as MMA, must "ensure" that MA Plans are sold in compliance with certification requirements. (App. 081; R. Doc. 27, ¶ 257.) Indeed, Aetna's own documentation states that "CMS holds (Aetna) responsible for the actions of all agents representing Aetna or Coventry." (App. 026, 035, 038; R. Doc. 27, ¶¶ 14, 70, 81.)

The complaint alleges that the Carrier Defendants made these promises knowing they were false, and that MMA's actions were the reason that those promises were false. Thus, as in *Miller*, the Carrier Defendants knowingly provided false information when they represented to the government that would comply with all Medicare rules and regulations. The Carrier Defendants' fraudulent intent can be inferred from their knowledge, which is alleged in the complaint. Relator Holt gave them all great detail about MMA's activities in September, 2017, so at least as of that point they knew how MMA was violating numerous Medicare regulations on their behalf. Yet, they continued to certify that

29

they would comply, knowing that they were responsible for MMA's actions, and knowing that MMA would not comply. From that information, reasonable jurors could conclude that the Carrier Defendants signed their certifications with the intent to deceive the government. The Complaint pleads that the Carrier Defendants knew that compliance was their ticket to participation in Medicare Advantage and they never intended to so comply. In *Miller,* such facts were sufficient to defeat summary judgment, *a fortiori*, they must be sufficient to state claims for relief at the pleading stage. *See Miller*, 840 F.3d at 501-02.

As to MMA, its wholesale failure to certify agents as required by the regulations, and the resultant, extensive, non-compliant activity, creates a strong inference that MMA never intended to comply with the Medicare regulations. Regarding intent, this Court noted in *Miller* that the defendant had engaged in a pattern of rules violations intended to maximize its federal funding. *Miller*, 840 F.3d at 501-02. The Complaint sets forth the myriad ways in which MMA violated the Medicare rules and regulations, including but not limited to cheating on certification tests; cold-calling potential Medicare recipients and knocking on doors; coercing seniors to switch plans, even if it harmed them; and insisting that all complaints go to MMA to protect the Carrier Defendants' star ratings. (*See, e.g.*, App. 042-44, 050, 062-63, 092-93; R. Doc. 27, ¶¶ 108-17, 141-43, 193-198, 327-31.) All of these allegations reveal MMA's nefarious intent.

Appellate Case: 23-2564    Page: 38    Date Filed: 09/22/2023 Entry ID: 5319197

While MMA did not make direct certifications to the government, as the Carrier Defendants did, certifications need not be direct to support a claim under the FCA. The Supreme Court has endorsed the "implied certification" theory of FCA liability. *See Escboar*, 579 U.S. at 181 (holding that liability can attach "when the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement."). Liability attaches where material facts are omitted to make the representations misleading. *Id.*

Here, MMA routinely submitted new applications to receive commissions, concealing its violations of the regulations governing sales of MA Plans to seniors. (App. 033, 039; R. Doc. 27, ¶¶ 59-61, 87.) The issue of whether those applications constitute "claims" is addressed below, but Relator Holt's allegations certainly cover the first two elements of fraud in the inducement. MMA has, on numerous occasions, made a "false record or statement," which MMA knew was false. *See Miller*, 840 F.3d at 500.

This Court need not dwell on those two elements, as they were not the basis for the district court's decision. Nonetheless, the Court should conclude that the allegations state a plausible claim that both the Carrier Defendants and MMA knowingly made false statements, overtly and/or by omission.

31

IV. **The District Court's conclusion that no Defendant made a claim under the FCA is wholly illogical as to the Carrier Defendants, and legally inaccurate as to MMA**.

Even though Relator Holt alleges that all Defendants have made substantial profits from the Medicare Advantage program, and even though the court was required to accept those facts as true, it somehow concluded that none of the Defendants made claims for payment. This Court should reverse that decision.

To state a claim under the FCA, a relator must allege that the defendant made a claim for payment from the government. *Miller*, 840 F.3d at 498. The FCA defines a "claim" as:

(A)  … any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

31 U.S.C.A. § 3729(b)(2)(A).

Here, Relator Holt alleges that "MMA has caused thousands of claims to be presented to the government under false pretenses because MMA has prevented virtually all of its agents from being properly certified either through AHIP or for the specific carriers MMA agents represent." (App. 040; R. Doc. 27, ¶ 95.) The complaint explains how the Carrier Defendants consistently certified to the government that they would follow all Medicare rules and regulations, including ensuring compliance by all agents, but these were knowingly false statements. (App. 083-84; R. Doc. 27, ¶¶ 272-80.) Thus, Relator Holt alleges that all of the Carrier Defendants' applications for enrollment "amount to false claims because the agents who sold the policies were not properly certified—and these applications are false claims to the government for the payment of commissions." (App. 044; R. Doc. 27, ¶ 120.)

## A. The Carrier Defendants' claims to the government directly resulted in government funding for the Medicare Advantage Plans.

As to the Carrier Defendants, it defies logic to conclude that they have not made "claims" to the government. The Carrier Defendants directly communicate and contract with the government, and are paid by the government based on the number of Medicare beneficiaries who sign up for the program. (App. 033-34, 077; R. Doc. 27, ¶¶ 62-66, 239-41.) Thus, by any logical conception of the term, the Carrier Defendants made "any request or demand … for money or property" that

33

was "presented to an officer, employee, or agent of the United States." 31 U.S.C.A. § 3729(b)(2)(A)(*i*). *See also United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 196 (4th Cir. 2022) (noting that it is sufficient to allege "a pattern of conduct that would necessarily have led to submission of false claims to the government for payment") (alterations omitted); *Thayer v. Planned Parenthood of the Heartland*, No. 4:11-CV-129-JAJ, 2019 WL 13039126, at *13 (S.D. Iowa Apr. 1, 2019), *aff'd sub nom. Thayer v. Planned Parenthood of the Heartland, Inc.*, 11 F.4th 934 (8th Cir. 2021) ("The parties do not dispute that PPH has submitted claims to the government for reimbursement for dispensing OCPs pursuant to its contract with Medicaid.").

The district court's (limited) analysis as to why the Carrier Defendants supposedly did not submit "claims" for payment should be rejected. The court's "claims" analysis wrongly relied on the position that the government pays a fixed amount per beneficiary, regardless of the number of them, and that MA Organizations—not CMS—pay commissions to agents such as MMA. (Add. 10-11; App. 419-20; R. Doc. 101 at 10-11.) The court held that Count I, and Counts and III through VI, are "premised on the payment by the Government being the commissions MMA received *from the insurance companies*." (Add. 11; App. 420; R. Doc. 101 at 11.) That statement shows a misunderstanding of the flow of payments, all of which are federal funds. (App. 033, 082; R. Doc. 27, ¶ 57, 60,

270.) The government pays the Carrier Defendants directly based on their annual bids. (App. 035; R. Doc. 27, ¶¶ 64-67.)

The Carrier Defendants contract directly with the government, through CMS. (App. 031; R. Doc. 27, ¶¶ 43-45.) They also contract with agents such as MMA to sell MA Plans. (App. 032; R. Doc. 27, ¶¶ 49-52.) Thus, all of the money involved flows through the Carrier Defendants. Some of what the Carrier Defendants receive is passed on to MMA in the form of commissions. (App. 033, 082; R. Doc. 27, ¶¶ 57, 60, 270.) But the Carrier Defendants also receive money for themselves, and—importantly—that amount increases with every beneficiary that signs up for a MA Plan. (App. 075; R. Doc. 27, ¶ 230.) MA Organizations typically make a profit margin of 15% of the total amount that CMS pays into the plan. (App. 075; R. Doc. 27, ¶ 231.) To obtain these funds, the Carrier Defendants have to apply every year, with Part C certifications promising to follow the regulations.

By applying to the government to obtain Medicare Advantage funds, the Carrier Defendants are making "claims." *See* 31 U.S.C.A. § 3729(b)(2)(A)(*i*) (defining claim as "any request or demand … for money or property" that was "presented to an officer, employee, or agent of the United States"). As the Ninth Circuit has explained, "it is irrelevant how the federal bureaucracy has apportioned the statements among layers of paperwork." *United States ex rel. Hendow v.*

*University of Phoenix*, 461 F.3d 1166, 1177 (9th Cir. 2006) (citing *United States ex rel. Main v. Oakland City Univ.,* 426 F.3d 914, 916 (7th Cir. 2005)). Instead, "[a]ll that matters is whether the false statement or course of conduct causes the government to 'pay out money or to forfeit moneys due.'" *Id.*

The district court's failure to consider fraudulent inducement is of particular importance vis-à-vis the "claims" of the Carrier Defendants. Relator Holt does not assert that CMS paid too much on a **per-claim** basis. Rather, she asserts that **all** the money CMS provided to the Carrier Defendants was distributed under false pretenses. That the payment amount is fixed has no bearing on whether the payments were justified in the first instance. Relator Holt specifically alleges that "[i]f CMS had known that signed MAP applications" submitted by the Carrier Defendants "were obtained as a result of violation of applicable state and federal laws, regulations and requirements, CMS would never have verified the enrollment of these beneficiaries into Medicare Advantage program." (App. 100; R. Doc. 27, ¶ 375.) Thus, the "claims" at issue are the Carrier Defendants' yearly applications for CMS funds.

The district court's ruling begs the question, how are the Carrier Defendants being paid by CMS if they have not made claims for government money? The ruling, if upheld, would insulate all MA Organizations from any liability under the FCA. If their applications to obtain government funds do not constitute "claims,"

then it is difficult to conceive of how they would ever make "claims" under the FCA. Surely, Congress did not intend that insurance companies marketing MA Plans to vulnerable seniors would be immune from suit under the FCA, no matter how deceptive they, or their agents, may be. In fact, the rules making MA Organizations responsible for the actions of their agents strongly suggest the opposite intent. (App. 081; R. Doc. 27, ¶ 257); 42 C.F.R. § 422.2272(e), 422.2274(c).

**B.     MMA made claims under the FCA, by submitting applications for the Carrier Defendants, expecting that its claims would be paid through government funds.**

Though MMA requires a different analysis on the "claim" issue, the result is the same. Because MMA made claims to third-parties (the Carrier Defendants) with the intent of receiving government funds, it also has made claims under the FCA.

Under the statutory definition, MMA makes its "request[s] or demand[s]" to the Carrier Defendants, who are "contractors, grantee[s], or other recipient[s]" of CMS funds through the Medicare Advantage program. 31 U.S.C.A. § 3729(b)(2)(A)(ii). The funds are clearly designed to "advantage a Government program or interest," specifically the Medicare Advantage program.

The U.S. Supreme Court has addressed FCA claims by agents in a similar context. *See Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662 (2008). In

37

*Allison Engine*, the U.S. Navy contracted with two shipyards to build destroyers. The shipyards then sub-contracted with Allison Engine to build generator sets. *Id.* at 665-66. The Court noted that, under the FCA, liability attaches to any person that "knowingly makes, uses, **or causes to be made** or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." *Id.* at 666 (citing 31 U.S.C. § 3729(a)(2) (emphasis supplied)). The statute does not require a direct request for payment to the government. Rather, it applies where "a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." *Id.* at 670 (citing 31 U.S.C. §3729(c)).

Therefore, Section 3729(a)(2) does not require that a defendant, itself, make a false claim. Rather, there must be proof—or, at this stage, it must be alleged—that the defendant "made a false record or statement for the purpose of getting 'a false or fraudulent claim paid or approved by the Government.'" *Id.* at 671. "Therefore, a subcontractor violates § 3729(a)(2) if the subcontractor submits a false statement to the prime contractor intending for the statement to be used by the prime contractor to get the Government to pay its claim." *Id.*

38

Here, the complaint alleges in great detail how MMA violated numerous Medicare Advantage rules and regulations but continually sent in claims for commission payments. (*See, e.g.*, App. 040; R. Doc. 27, ¶ 95 ("MMA has caused thousands of claims to be presented to the government under false pretenses because MMA has prevented virtually all of its agents from being properly certified either through AHIP or for the specific carriers MMA agents represent."); App. 073; R. Doc. 27, ¶ 218 ("Each of these applications [for the Medicare Advantage program] and the thousands of others obtained by MMA agents that were submitted to CMS were false claims because they were premised on the agent being properly Medicare Advantage Certified and carrier-certified, which MMA agents were not.").) Relator Holt further alleges that MMA knowingly or recklessly submitted applications for MA Plans from agents whom it knew were not properly certified to sell those plans. (App. 096; R. Doc. 27, ¶ 348.) As MMA intended, these applications resulted in increased commission payments. (App. 096; R. Doc. 27, ¶ 350.) On those facts, MMA submitted numerous "claims" under the FCA. *See Allison Engine*, 553 U.S. at 670 (holding that a subcontractor makes a "claim" under the FCA where it submits a request for payment—whether to a contractor or to the government—with the intent that the government will pay the claim).

Appellate Case: 23-2564    Page: 47    Date Filed: 09/22/2023 Entry ID: 5319197

The district court's focus on the fact that the carriers pay MMA directly, rather than the government, places form over substance. (Add. 10-11; App. 419-20; R. Doc. 101 at 10-11.) Every new beneficiary that MMA signs up increases the commissions that MMA receives, while also increasing the number of claims paid to the Carrier Defendants, at a 15% or greater profit margin. (App. 075, 041; R. Doc. 27, ¶¶ 98-103, 230-32.) The compensation for these commissions comes from federal dollars. (*See* App. 041; R. Doc. 27, ¶ 99 (explaining that CMS sets the rates for agent commissions).) Thus, all Defendants have made "claims" for payment, as that term is defined by the FCA.

## V. The District Court also erred in concluding that the Defendants' actions were not material to the government.

The final element is materiality, and this Court should reverse the district court's conclusion that well-pleaded allegations of paying thousands of illegitimate commissions and related payments for Medicare Advantage enrollments was immaterial to the government. As stated in *Miller*, a false record or statement is "material" if either "(1) a reasonable person would likely attach importance to it or (2) the defendant knew or should have known that the government would attach importance to it." Both apply here.

### A. *Miller* and several other circuit cases are on point.

Materiality was a key issue in *Miller*. The Court considered whether the government conditioned payment on following relevant government rules. *Miller*,

840 F.3d at 503-04. Here, Relator Holt alleges several conditions must be met for CMS to pay commissions, including but not limited to agents being authorized to sell MA Plans, and CMS validating enrollment forms submitted by MA Organizations. (App. 046; R. Doc. 27, ¶¶ 126.)

Under the regulations, agents may only receive commissions if they are in good standing, as defined by CMS. (App. 032-33; R. Doc. 27, ¶¶ 54-56.) MMA committed rampant fraud in the testing process, thereby preventing any agents from being properly certified. (App. 044; R. Doc. 27, ¶¶ 118.) Thus, none of MMA's agents were in "good standing" and authorized to sell MA Plans, and the government should not have paid any of those commissions. (App. 035, 041; R. Doc. 27, ¶¶ 68, 103.)

Meanwhile, the Carrier Defendants certified that they would abide by all of the Medicare Advantage rules and regulations, as required to become a MA Organization. (App. 031, 083; R. Doc. 27, ¶¶ 44, 272-78.) MA Organizations, including the Carrier Defendants, are responsible for any agents working on their behalf. (App. 035; R. Doc. 27, ¶ 70.) Thus, hiring, and supervising agents who follow the regulations is a condition of participation as an MA Organization. Yet, even if a total lack of oversight somehow is deemed to meet the Carrier Defendants' supervisory obligations, they continued collecting on MA Plans sold by MMA, even after receiving complete information about MMA's illegal

41

activities. (App. 098; R. Doc. 27, ¶¶ 366-68.) This fact weighs heavily in favor of materiality.

This Court's discussion in *Miller* also demonstrates the materiality of fraudulently inducing the government to pay money according to a government program. There, the program was designed to help students, and the school falsified information to increase eligibility and, therefore, federal funds received. *Miller*, 840 F.3d at 498-99. Liability for the specific claims for payment attached "so long as the original contract was obtained through false statements or fraudulent conduct." *Id.* at 504 (quoting *Baycol*, 732 F.3d at 875-76). Here, the Carrier Defendants' false certifications allowed them to receive federal funds, and MMA's false implied certifications—omitting material information about its violations of Medicare rules and regulations—allowed MMA to receive commissions. Thus, as the Court noted in *Miller*, fraudulent inducement tainted all of the transactions.

Another key point from *Miller* is that harm is not an element of materiality under the FCA. *Id.* at 505. The district court was concerned that no one ineligible for Medicare was given benefits. (Add. 15; App. 424; R. Doc. 101 at 15.) First, it is unclear whether that is true. But second, whether a beneficiary was eligible for Medicare or not is only the first of several government concerns. The law here does not ask whether the government was providing services that it typically

42

provides, but whether the Defendants' fraud materially influenced the government's decision to **enter into contracts with** the Defendants. *Miller*, 840 F.3d at 505; s*ee also United States v. Care Alternatives*, No. 22-1035, 2023 WL 5494333, at *5 (3d Cir. Aug. 25, 2023) (explaining that materiality is determined by examining the importance of the Defendants' violations, not by examining the services provided).

Since *Miller*, several other cases have held that various defendants' fraud on the government could be deemed material in the context of the FCA or a similar inquiry. *See, e.g.*, *Care Alternatives*, 2023 WL 5494333, at *6; *United States v. Strock*, 982 F.3d 51, 65 (2d Cir. 2020); *Campbell v. Transgenomic, Inc.*, 916 F.3d 1121, 1125-26 (8th Cir. 2019); *United States ex rel. USN4U, LLC v. Wolf Creek Fed. Servs., Inc.*, 34 F.4th 507, 516 (6th Cir. 2022); *Prather*, 892 F.3d at 836-37. Further, the Ninth Circuit's decision in *Hendow*, which preceded *Miller*, is on point in holding that FCA violations were material. *See Hendow*, 461 F.3d at 1177.

In *Campbell*, this Court found materiality in the context of alleged securities fraud. Though the case did not involve the FCA, the claim required a similar analysis, and this Court relied in part on *Escobar*. *See Campbell*, 916 F.3d at 1125 (citing *Escobar*, 136 S. Ct. at 2000 & n.3). In *Campbell,* the Court reversed the district court's dismissal of the complaint, holding that there was a question of fact as to whether a reasonable investor would have attached importance to missing

43

information—in other words, whether that missing information was material. *Id.* at 1125-26. This Court should likewise let the jury decide whether these Defendants' fraud was material to the government in deciding whether to allow Defendants' participation in Medicare Advantage.

**B. Materiality, under Escobar, is met in this case.**

The three factors discussed in *Escobar* for determining materiality are:

- Whether the requirement was an express condition of payment, *Strock*, 982 F.3d at 62 (citing *Escobar*, 136 S. Ct. at 2003);

- The government's response to similar misrepresentations, *id.*; and

- Whether noncompliance was minor or insubstantial. *Id.* at 63 (citing *Escobar*, 136 S. Ct. at 2003).

On the first element, compliance with Medicare regulations was a clearly stated condition for the Carrier Defendants to become MA Organizations—thereby allowing them to receive federal funds. (App. 083-84; R. Doc. 27, ¶¶ 272-78.) Citing only a district court case from Hawaii, the district court took an extremely narrow view of this element, stating that the Medicare regulations do not expressly make compliance a condition of payment. (Add. 13; App. 422; R. Doc. 101 at 13, citing *Haw. ex rel. Torricer v. Liberty Dialysis-Haw. LLC*, 512 F. Supp. 3d 1096, 1122 (D. Haw. 2021).) That analysis ignores the clear purpose of requiring MA

44

Organizations to certify that they will follow the rules to participate in the program.[8]

Other cases have taken a more pragmatic approach to the first *Escobar* element. For instance, the *Strock* court rejected placing too much emphasis on whether conditions were tied directly to payment, stating that "where a misrepresentation relates to a condition of eligibility, examining only the express conditions of ultimate payment will obscure the true materiality of a requirement." *Strock*, 982 F.3d at 62. Thus, where compliance with particular regulations was a condition of eligibility, that factor "weighs in favor of a finding of materiality." *Id.* *See also Prather*, 892 F.3d at 832 (where physician's certification was requirement under Medicare Parts A and B, failure to provide proper certifications was material); *Care Alternatives*, 2023 WL 5494333, at *4 (hospice providers had to produce certain documentation to bill CMS, so missing documents were material); *Hendow*, 461 F.3d at 1173 (holding that the applicable regulations "demonstrate that compliance with the incentive compensation ban is a necessary condition of continued eligibility and participation," thus supporting a finding of materiality).

---

[8] The purpose of the regulations requiring proper certification is evident from MMA's conduct. Relator Holt alleges that part of MMA's scheme was ensuring that its agents **did not** know the rules. (App. 040; R. Doc. 27, ¶ 95.) This allowed MMA to coerce its agents into various improper means of selling MA Plans, as outlined in the Complaint.

Appellate Case: 23-2564     Page: 53     Date Filed: 09/22/2023 Entry ID: 5319197

The second element—the government's reaction—should be considered neutral where, as here, the Defendants' fraud hid their violations of the Medicare Advantage regulations from the government. *See Prather*, 892 F.3d at 834 (holding that "it would be illogical to require a relator (or the United States) to plead allegations about past government action in order to survive a motion to dismiss when such allegations are relevant, but not dispositive") (citing *Escobar*, 136 S. Ct. at 2003). Further, because the complaint is construed in the light most favorable to the plaintiff, courts should not infer the absence of government action simply because past government action is not described in the complaint. *Id.* Similarly, the government's failure to intervene is immaterial. *Id.* at 836. *See also Miller*, 840 F.3d at 499 (noting that the government had declined to intervene in a case where this Court reversed the grant of summary judgment).

The district court relied heavily on the government's supposed inaction, (Add. 13; R. Doc. 101 at 13), but the absence of allegations about government action does not indicate that the government does not care about MA Organizations ignoring rules that they have promised to follow.

Finally, the third element, whether the Defendants' noncompliance was substantial, weighs heavily for materiality. *Strock*, 982 F.3d at 65 (citing *Escobar*, 136 S. Ct. at 2003). In *Strock*, the Second Circuit rejected the district court's reasoning, which deemed the violations to be non-substantial because they did not

46

directly influence the payment decision. Rather, the issue in assessing a fraudulent inducement theory is whether the violations were substantial in the context of "the government's decision to award the relevant contracts or ultimately pay out under those contracts." *Id.* Ultimately, because following the rules was a condition of program eligibility, and because the defendants' violations were substantial to the government's decision to award the contract, the defendants' alleged violations were held to be material. *Id.*

The same is true here. As detailed extensively in the Statement of Facts and in the Complaint as a whole, MMA, working on behalf of the Carrier Defendants, flouted the agent certification rules, and then violated virtually the entire marketing regulatory scheme to sign up more beneficiaries and increase profits for itself and the Carrier Defendants. MMA cheated to get agents certified, and then trained agents (who had no contrary frame of reference from having been properly certified) to violate rules regarding door knocking, cold calls, the use of lead cards, switching beneficiaries to new plans, and others. Relator Holt alleges that this widespread fraud led to MMA receiving more than $100 million in commissions since joining the program and the Carrier Defendants (collectively) making nine-figure profits from the state of Missouri alone in a single year. (App. 041, 076; R. Doc. 27, ¶¶ 102, 237.) The alleged fraud was clearly substantial, or at the very least sufficiently alleged to be substantial. *Cf. Miller*, 840 F.3d at 504-05 (reversing

47

summary judgment while viewing the materiality issue in the light most favorable to the government).

*Care Alternatives* is also instructive on the issues of substantiality and, therefore, materiality. The Third Circuit first rejected the argument that the violations were non-substantial because every hospice patient treated received "good, compassionate care." *Care Alternatives*, 2023 WL 5494333, at *5. Instead of focusing on the services given, the court focused on whether the defendant's violations—i.e., certifying patients for the program without sufficient documentation—were material to participation in the program. *Id.* Then, the court explained that it was "not a case about occasional noncompliance." *Id.* at *6. Instead, there was "significant evidence in the record ... that Care Alternatives had longstanding problems with maintaining necessary and proper documentation." *Id.* Here, Relator Holt also has alleged continual noncompliance with the applicable rules, in myriad ways.

The constant nature of the Defendants' violations, as well as their significant financial impact, shows that they were substantial. Relator Holt has, therefore, stated a valid claim under the FCA. The complaint properly alleges all four elements outlined in *Miller*.

48

## VI. Alternatively, the Court should allow Relator Holt to amend her pleading.

If the Court agrees that Relator Holt validly stated a claim, then it need not address the issue of repleading. But the district court also erred in denying her alternative request to file an amended complaint. (App. 471-72; R. Doc. 109 at 3-4.) This Court "review[s] the denial of leave to amend for abuse of discretion and questions of futility *de novo.*" *United States ex rel. Roop v. Hypoguard USA, Inc.*, 559 F.3d 818, 822 (8th Cir. 2009). The district court's decision was based on futility, so that aspect should be reviewed de novo.

The district court should have given Relator Holt the opportunity to fix the purported deficiencies in her complaint. *See, e.g.*, *United States ex rel. Brooks v. Stevens-Henager Coll.*, 305 F. Supp. 3d 1279 (D. Utah 2018) (permitting plaintiff to replead, rather than dismissing FCA claim with prejudice). Instead, the court simply held that "[a]ll claims against all Defendants are DISMISSED WITH PREJUDICE." (Add. 7; App. 426; R. Doc. 101 at 17.) This was an error. *Cf. Sentis Group, Inc. v. Shell Oil Co.*, 559 F.3d 888, 901 (8th Cir. 2009) (dismissal with prejudice is a "draconian sanction"); *Martin v. Safe Haven Sec. Servs., Inc.*, 19-00063, 2020 WL 13538608, at *2 (W.D. Mo. May 14, 2020) ("Dismissals with prejudice are drastic and extremely harsh sanction[s].") (citations and quotations omitted). In denying the Rule 59(e) motion, the court stated that amendment would

49

be futile regardless of any new allegations because of the court's ruling as to materiality. (App. 471-72; R. Doc. 109 at 3-4.)

If the Court agrees with the district court that some aspect of the fraudulent inducement claim was inadequately pleaded, but also agrees with Relator Holt that the alleged violations were plausibly material, then the Court should reverse and remand the case to allow Relator Holt to replead.

## CONCLUSION

For all of the foregoing reasons, the district court erred in granting the Defendants' motions to dismiss. This Court should reverse the district court's decision and remand the case for discovery and, eventually, trial. Alternatively, this Court should at least reverse the district court's decision dismissing the case with prejudice and remand the case with instructions to permit Relator Holt to file an amended complaint to address whatever deficiencies this Court identifies.

Respectfully submitted,

/s/ Kara A. Elgersma

Tyler W. Hudson
WAGSTAFF & CARTMELL LLP
4740 Grand Avenue, Suite 300
Kansas City, Missouri 64112
(816) 701-1100

James J. Pepper
THE PEPPER LAW FIRM, LLC
68 East Court Street, Suite 2A
Doylestown, Pennsylvania 18901
(215) 340-2500

Kenneth A. Wexler
Kara A. Elgersma
Eaghan S. Davis
WEXLER BOLEY & ELGERSMA LLP
311 South Wacker Drive, Suite 5450
Chicago, Illinois 60606
(312) 346-2222

*Counsel for Plaintiff-Relator/Appellant*
*Elizabeth D. Holt*

50

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a). This brief contains 11,330 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in fourteen (14) point Times New Roman font.

Dated:   September 22, 2023

*/s/ Kara A. Elgersma*
Kara A. Elgersma
One of the Attorneys for Appellant

**CIRCUIT RULE 28A(h) CERTIFICATION**

The undersigned hereby certifies that I have filed electronically, pursuant to

Circuit Rule 28A(h), a version of the brief in non-scanned PDF format. I hereby

certify that the file has been scanned for viruses and that it is virus-free.


*/s/ Kara A. Elgersma*
Kara A. Elgersma

Appellate Case: 23-2564   Page: 60   Date Filed: 09/22/2023 Entry ID: 5319197

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 22, 2023, an electronic copy of the Brief of Appellant Elizabeth D. Holt was filed with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. The undersigned also certifies that all participants in this case are registered CM/ECF users and that service of the Brief will be accomplished by the CM/ECF system.

*/s/ Kara A. Elgersma*
Kara A. Elgersma

Appellate Case: 23-2564   Page: 61   Date Filed: 09/22/2023 Entry ID: 5319197